**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Jan 23 2013, 9:30 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**JUSTIN R. WALL**
Wall Legal Services
Huntington, Indiana

ATTORNEYS FOR APPELLEE:

**CHRISTINE REDELMAN**
Indiana Department of Child Services
Indianapolis, Indiana

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| IN THE MATTER OF THE TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF: <br><br> A.B. & P.B. (Minor Children), <br><br> AND <br><br> E.B. (Mother), <br><br>     Appellant-Respondent, <br><br>       vs. <br><br> THE INDIANA DEPARTMENT OF CHILD SERVICES, <br><br>     Appellee-Petitioner. | No. 35A05-1206-JT-298 |

APPEAL FROM THE HUNTINGTON JUVENILE COURT
The Honorable Thomas M. Hakes, Judge
Cause Nos. 35C01-1103-JT-6 & 35C01-1103-JT-7

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**VAIDIK, Judge**

## Case Summary

E.B. ("Mother") appeals the involuntary termination of her parental rights to her children, A.B. and P.B. Concluding that clear and convincing evidence supports the trial court's judgment, we affirm.

## Facts and Procedural History

Mother is the biological mother of A.B., born in January 2007, and P.B., born in September 2009.[1] The local Huntington County office of the Indiana Department of Child Services ("HCDCS") became involved with Mother in 2008 after receiving a referral that the family home was in an unsafe and unsanitary condition. HCDCS caseworkers visited the home and observed: (1) "numerous piles of dog feces in every room upstairs"; (2) "trash, clothing, dirty diapers, and cigarette butts" littering the "entire" kitchen and living-room floors; and (3) the only toilet in the home was "full of human waste and not functioning." Petitioner's Ex. 1.1.[2] In addition, there was no electricity in the lower level of the house, so an extension cord was being utilized to supply power for a toaster and hot plate on the lower level. By the next day, the house

---

[1] K.B. is A.B.'s biological father. K.M. is P.B.'s biological father. Both fathers voluntarily relinquished their parental rights to their respective child during the underlying proceedings. In addition, neither father participates in this appeal. We therefore limit our recitation of the facts to those pertinent solely to Mother's appeal.

[2] Unfortunately, the pages of the Volume of Exhibits submitted on appeal were not enumerated. We therefore cannot cite to any specific page numbers throughout this Opinion.

had been cleaned, but the toilets remained non-functioning. In addition, Mother assured caseworkers that the family was moving that weekend.

Approximately one week later, HCDCS received another referral that the family had not moved and that the home was once again in an unsafe and unsanitary condition. A second assessment of the home revealed that the electrical and plumbing issues had not been resolved, dog feces was smeared on the kitchen floor, trash, clothing and other debris covered the living room floor, and the home now had a condemnation notice posted on the door. Additionally, it was reported that Animal Control had taken the family dogs to a local shelter.

As a result of its assessment, HCDCS filed a petition alleging A.B. was a child in need of services ("CHINS"). The child was so adjudicated in December 2008. Although the trial court allowed A.B. to remain in Mother's physical custody as an in-home CHINS, preliminary services were offered to the family. In January 2009, the trial court issued a dispositional order formally removing A.B. from Mother's legal custody and directing Mother to participate in and successfully complete a variety of services designed to help her maintain the safety, stability, and sanitary conditions of the family home. The court's dispositional order also directed Mother to participate in individual counseling to address her historical pattern of dating sex offenders, equip her with appropriate discipline techniques, and help her learn how to deal with stress. In addition, psychological testing for Mother was ordered to rule out any mental illnesses and to further address Mother's parenting deficiencies.

For the next several months, Mother refused to participate in court-ordered reunification services on a regular basis. P.B. was born in September 2009. The next month, following another verified report of unsafe and unsanitary conditions in the family home, P.B. was adjudicated a CHINS. Although HCDCS petitioned the trial court to remove both children from Mother's physical care at that time, the request was denied.

Mother's participation in reunification services continued to be sporadic and ultimately unsuccessful. For example, Mother refused to complete a psychological evaluation for approximately eighteen months after the trial court's initial order to do so. Although there were brief periods of time during which Mother cooperated with caseworkers and service providers, she was unable to consistently demonstrate an ability to implement the parenting techniques she was being taught. In addition, the family moved frequently and experienced several periods of homelessness, and Mother continued to engage in an on-and-off-again relationship with her domestic partner despite repeated episodes of domestic violence that oftentimes occurred in the presence of the children.

In January 2010, HCDCS again petitioned the trial court to modify its dispositional order and to remove the children from Mother's physical care. The trial court denied HCDCS's request. In April 2010, however, the children were removed from Mother and placed in foster care due to the ongoing lack of stability in the family home. Although a three-month trial home visit was later attempted in September 2010, Mother returned the children to foster care later the same month after being involved in a domestic dispute and losing her housing.

In January 2011, another domestic dispute between Mother and her domestic partner occurred in the family home. Mother was arrested for Class A misdemeanor battery. Mother was later convicted and remained incarcerated until July 2011. Meanwhile, in March 2011, HCDCS filed petitions under separate cause numbers seeking the involuntary termination of Mother's parental rights to both children.

A consolidated evidentiary hearing on the termination petitions was held in September 2011. During the hearing, HCDCS presented considerable evidence regarding Mother's failure to successfully complete a majority of the court-ordered reunification services, including individual counseling and home-based services, and that she remained unable to demonstrate she was capable of providing the children with a safe and stable home environment. Among other things, HCDCS presented evidence establishing that Mother remained unemployed, never took responsibility for her role in the removal of the children from her care, and continued to struggle with anger-management issues. In addition, Mother had resided in approximately twelve different locations, including the Huntington County Jail, during the underlying proceedings. Although the evidence reveals that Mother eventually secured housing in October 2010 that appeared to be suitable for the children, the residence belonged to Mother's domestic partner, whom Mother continued to live with and be financially dependent upon despite significant past incidents of domestic violence. Mother also never completed court-ordered home-based counseling and intensive family preservation services, but she continued to participate in at least some of these services at the time of the termination hearing.

5

As for the children, Guardian ad Litem ("GAL") Joseph Wiley indicated he was concerned about the pattern of violence in the family home, as well as Mother's anger issues and the potential for future neglect and abuse should the children be returned to Mother's care. Nevertheless, GAL Wiley declined to offer an opinion as to whether termination of parental rights was appropriate due to his recent appointment to the case. HCDCS family case manager Bobbie Lamb, on the other hand, did recommend termination of Mother's parental rights as in the children's best interests. Family Preservation Counselor Rosella Stouder likewise testified that she had numerous concerns pertaining to the lack of safety and sanitary conditions found in the various residences Mother had lived in throughout this case. Stouder further confirmed that she remained concerned about the "underlying anger" and "control issues" that were prevalent in the family home. Tr. p. 39. In addition, Stouder testified that Mother had informed her on "two or three occasions" that Mother's domestic partner had been "abusing" Mother and "the girls" and that three-year-old A.B. had been observed "masturbating." *Id.* at 42.

At the conclusion of the termination hearing, the trial court took the matter under advisement. In November 2011, the trial court issued its judgment terminating Mother's parental rights to both children. Mother appealed, claiming there were insufficient factual findings to support the trial court's judgment. On May 9, 2012, another panel of this Court reversed the trial court's termination order in an unpublished Memorandum Decision and remanded this cause for further proceedings. *See A.B. v. Ind. Dep't of Child Servs.*, 968 N.E.2d 341 (Ind. Ct. App. 2012). In so doing, this Court noted that although

6

the trial court had made thirty-one specific findings concerning Mother's failure to consistently participate in and benefit from court-ordered reunification services, inability to retain and implement the parenting techniques being taught to her by service providers, refusal to disengage from unhealthy and physically violent personal relationships, and ongoing inability to provide a safe and sanitary home environment, the trial court had neglected to make any findings whatsoever specifically pertaining to the requisite statutory elements delineated in Indiana's involuntary termination statute.

On May 25, 2012, the trial court entered an amended judgment terminating Mother's parental rights to A.B. and P.B. Mother now appeals.

**Discussion and Decision**

The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. *In re I.A.*, 934 N.E.2d 1127, 1132 (Ind. 2010). "A parent's interest in the care, custody, and control of his or her children is 'perhaps the oldest of the fundamental liberty issues.'" *Id.* (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). "Indeed[,] the parent-child relationship is 'one of the most valued relationships in our culture.'" *Id.* (quoting *Neal v. DeKalb Cnty. Div. of Family & Children*, 796 N.E.2d 280, 285 (Ind. 2003)). Nevertheless, parental rights are "not absolute and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate parental rights." *Id.* (citing *In re D.D.*, 804 N.E.2d 258, 264-65 (Ind. Ct. App. 2004), *trans. denied*). Thus, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *Id.*

7

When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *D.D.*, 804 N.E.2d at 265. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* Here, the trial court made specific findings and conclusions in its termination order. When a trial court enters specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). In deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*; *see also Bester*, 839 N.E.2d at 147. Clear error is that which leaves us with a definite and firm conviction that a mistake has been made. *In re A.N.J.*, 690 N.E.2d 716, 722 (Ind. Ct. App. 1997).

In Indiana, before parental rights may be involuntarily terminated, the State is required to allege and prove, among other things:

(B)    that one (1) of the following is true:

    (i)    There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

    (ii)    There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii)    The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C)    that termination is in the best interests of the child; and

(D)    that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2).[3]  In addition, HCDCS has the burden of pleading and proving each element of Indiana Code § 31-35-2-4(b) by "'clear and convincing evidence'" before the trial court can involuntarily terminate parental rights. *In re G.Y.*, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting Ind. Code § 31-37-14-2).  Mother challenges the sufficiency of the evidence supporting the trial court's judgment as to subsections (B), (C), and (D) of the termination statute detailed above. *See* Ind. Code § 31-35-2-4(b)(2)(B)-(D).

### I. Conditions Remedied/Threat to Well-Being

Indiana Code section 31-35-2-4(b)(2)(B) requires a trial court to find only one of the three elements of subsection (b)(2)(B) has been established by clear and convincing evidence before properly terminating parental rights. *See L.S.*, 717 N.E.2d at 209.  Here, the trial court determined that subsection (b)(2)(B)(i) was established by clear and convincing evidence, that is to say that HCDCS proved by clear and convincing evidence there is a reasonable probability the conditions resulting in A.B.'s and P.B.'s removal and/or continued placement outside of Mother's care will not be remedied. *See* I.C. § 31-35-2-4(b)(2)(B)(i).

---

[3]  Indiana Code section 31-35-2-4 was amended by Pub. L. No. 48-2012 (eff. July 1, 2012).  The changes to the statute became effective after the filing of the termination petition involved herein and are not applicable to this case.

In making such a determination, a trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re J.T.*, 742 N.E.2d 509, 511 (Ind. Ct. App. 2001), *trans. denied*. The court must also evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation of the child. *In re M.M.*, 733 N.E.2d 6, 13 (Ind. Ct. App. 2000). Similarly, courts may consider evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *A.F. v. Marion Cnty. Office of Family & Children*, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), *trans. denied*. The trial court may also consider the services offered to the parent by a county office of the Indiana Department of Child Services and the parent's response to those services, as evidence of whether conditions will be remedied. *Id.* at 1252. Finally, the language of Indiana's termination statute makes clear that "it is not just the basis for the initial removal of the child that may be considered for purposes of determining whether a parent's rights should be terminated, but also those bases resulting in the continued placement outside of the home." *In re A.I.*, 825 N.E.2d 798, 806 (Ind. Ct. App. 2005), *trans. denied*

Here, in determining that there is a reasonable probability the conditions resulting in the children's removal and/or continued placement outside of Mother's care will not be remedied, the trial court made detailed findings in its termination order regarding Mother's unresolved parenting, housing, and employment issues, as well as her lack of progress in improving her ability to provide a safe and stable home environment for the

10

children. With regard to Mother's history of domestic violence, the trial court noted that domestic disputes had occurred in the family home in September 2010, December 2010, and again in January 2011, after which Mother was arrested and incarcerated for misdemeanor battery. The court also specifically acknowledged the testimony of several service providers who confirmed Mother had "resided in twelve (12) different locations[,] including the Huntington County Jail" during the history of this case, "failed to complete home-based counseling [and] home-based services," "routinely" failed to have utilities in her various residences, "disclosed that her domestic partner had 'molested' the minor child, [A.B.]" and "failed to show a transfer of learning" of the parenting and discipline techniques Mother had been taught by service providers. Appellant's App. p. 20. Based on these and other findings, the trial court concluded that "Mother's actions and failures throughout this period show[] that there is a reasonable probability that the reasons for placement will not be remedied." *Id.* at 22. Our review of the record leaves us convinced that these findings and conclusions are supported by abundant evidence.

During the termination hearing, case manager Lamb confirmed that she had been working with Mother and the family for just under three years. Lamb further testified that notwithstanding the wealth of services available to Mother throughout the underlying CHINS and termination proceedings, Mother had failed to (1) complete home-based counseling, (2) complete home-based caseworker services designed to help Mother maintain the condition of her home and work on parenting skills, budgeting, and self-sufficiency, and (3) maintain weekly contact with HCDCS. Lamb also informed the trial court that Mother had failed to obtain her GED, never obtained employment, oftentimes

11

did not have electricity or heat in the home she was living in at the time, and refused to take her prescription medication as prescribed. When asked whether she believed there was a reasonable probability that the conditions resulting in the children's removal would be remedied, Lamb answered, "No." Tr. p. 25.

Family Preservation Counselor Stouder also testified during the termination hearing. When asked to describe her observations of Mother and the children during home visits, Stouder reported that there was "a lot of uh, arguing and fighting" and "animosity between the members of the family." *Id.* at 51. Stouder went on to state that the household seemed to be "in constant turmoil" with family members "erupting" into daily "screaming arguments" and that despite her attempt to help, there was "very little effect on changing that behavior." *Id.* at 51, 54. Stouder further explained:

> After two[-]and[-]a[-]half years of home[-]based services, [Mother] failed to show a transfer of learning in the area of understanding her children's needs, how to discipline consistently and appropriately, and most importantly . . . [how] to maintain a safe environment for her [children] and provide basic necessities. [Mother] often failed to put her [children's] needs first as evidenced through relationships she entered.

*Id.* at 58-59. In addition, concerns regarding Mother's unresolved parenting issues, housing and income instability, and potential for future neglect of the children were likewise indicated in the testimony of GAL Wiley.

As previously explained, a trial court must judge a parent's fitness to care for his or her children at the time of the termination hearing, taking into consideration the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the children. *D.D.*, 804 N.E.2d at 266. Where a parent's "pattern of

12

conduct shows no overall progress, the court might reasonably find that under the circumstances, the problematic situation will not improve." *In re A.H.*, 832 N.E.2d 563, 570 (Ind. Ct. App. 2005). Moreover, a trial court need not wait until a child is irreversibly influenced by a deficient lifestyle such that his or her physical, mental, and social growth are permanently impaired before terminating the parent-child relationship. *In re E.S.*, 762 N.E.2d 1287 (Ind. Ct. App. 2002).

Throughout the underlying proceedings, Mother has demonstrated a persistent unwillingness and inability to take the actions necessary to show she is capable of refraining from engaging in abusive relationships and providing A.B. and P.B. with the safe and stable home environment the children need. Based on the foregoing, we conclude that that there is clear and convincing evidence to support the trial court's findings set forth previously, as well as the court's ultimate determination that there is a reasonable probability the conditions leading to A.B.'s and P.B.'s removal and continued placement outside of Mother's care will not be remedied. Mother's arguments to the contrary amount to an impermissible invitation to reweigh the evidence. *See D.D.*, 804 N.E.2d at 265.

## II. Best Interests

We next consider Mother's assertion that HCDCS failed to prove termination of her parental rights is in the children's best interests. In determining what is in the best interests of a child, the trial court is required to look beyond the factors identified by the Indiana Department of Child Services and look to the totality of the evidence. *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003).

13

In so doing, the trial court must subordinate the interests of the parent to those of the child. *Id.* A trial court need not wait until a child is irreversibly harmed such that his or her physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *Id.* at 199.

In addition to the specific findings and conclusions previously cited, the trial court made several additional pertinent findings and conclusions in determining that termination of Mother's parental rights is in A.B.'s and P.B.'s respective best interests. Specifically, the court found that Mother had "disclosed" to Stouder that her domestic partner "had 'molested' the minor child, [A.B.]." Appellant's App. p. 20. The court further found that A.B.'s behavior "worsened when visitation [with Mother] increased but improved after visitation was ended due to [M]other's incarceration," and that A.B. continues to have "problems that will need continued attention." *Id.* Based on these and other findings, the trial court concluded, "Mother's actions have placed the children in positions of danger[.] . . . Mother has not attempted to correct the issues that would remedy the out[-]of[-]home placement. . . . [T]ermination is therefore in the children's best interests." *Id.* at 22. These findings and conclusions, too, are supported by the evidence.

The record reveals that A.B. suffers with several mental-health issues including Disruptive Behavior Disorder, Post-Traumatic Stress Disorder, and Reactive Attachment Disorder. A.B. also meets the criteria for Adjustment Disorder. During the termination hearing, A.B.'s therapist, Lynn Baker, described A.B.'s behaviors as "aggressive" and "inappropriate." Tr. p. 71. Baker also relayed episodes of "unprovoked rage," "spitting,"

14

and "biting" in the foster home. *Id.* at 71, 75. When describing A.B.'s conduct during play therapy, Baker testified that A.B.'s play therapy "is highly revolved around the trauma that [A.B.] has been through." *Id.* at 71. Baker further explained that A.B.'s play characters are "aggressive" with each other, use "vicious mean voices," and that A.B. "identifies the abuser as 'mom' and has it yelling at the kids and locking them in rooms." *Id.* Baker thereafter informed the trial court that A.B.'s behavior "indicates a child with very deep emotional scarring from very poor parenting in the past." *Id.* at 72. When asked whether she had any concerns for the future of A.B., Baker responded, "I have grave concerns for [A.B.] if [the child is placed] back in the environment she's been in before." *Id.* at 77.

Case manager Lamb and home-based therapist Patricia Fox likewise both recommended termination of Mother's parental rights as in the children's best interests. In so doing, Fox reported that "not much has changed" as far as Mother's lack of progress in services and unwillingness to take "personal responsibility" for "the position she's gotten in to." *Id.* at 94. Fox further testified that A.B.'s behavior had regressed following the trial home visit such that the "[v]ulger language, anger, [and] acting out started slowly coming back" to the point that Fox had to refer A.B. for more evaluation. *Id.* at 95.

Based on the totality of the evidence, including Mother's unresolved parenting, domestic violence, and housing instability issues, coupled with the testimony from Baker, Lamb, and Fox recommending termination of Mother's parental rights, we conclude that

clear and convincing evidence supports the trial court's determination that termination of Mother's parental rights is in A.B.'s and P.B.'s respective best interests.

### III. Satisfactory Plan

Finally, we consider Mother's allegation that HCDCS failed to show by clear and convincing evidence that it had a satisfactory plan for the future care and treatment of the children. Indiana Code section 31-35-2-4(b)(2)(D) provides that before a trial court may terminate a parent-child relationship, it must find that there is a satisfactory plan for the future care and treatment of the child. *D.D.*, 804 N.E.2d at 268. It is well established, however, that this plan need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated. *Id.* HCDCS's plan for A.B. and P.B. is adoption. This plan provides the trial court with a general sense of the direction of the children's future care and treatment. HCDCS's plan is therefore satisfactory. *See id.* (concluding that the State's plan for child to be adopted by current foster parents or another family constitutes a suitable plan for future care of child).

This Court will reverse a termination of parental rights "'only upon a showing of 'clear error'– that which leaves us with a definite and firm conviction that a mistake has been made.'" *In re A.N.J.*, 690 N.E.2d at 722 (quoting *Egly v. Blackford Cnty. Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1235 (Ind. 1992)). We find no such error here.

Affirmed.

BAILEY, J., and BROWN, J., concur.

16